**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-CR-20338-ALTMAN**

**UNITED STATES OF AMERICA**

**v.**

**EMILY SMITH a/k/a**
**"Melissa Truesdell," a/k/a**
**"Isabella Lux,"**

**Defendant.**
______________________________________/

**MOTION FOR DETENTION**

This Court should detain the Defendant because no condition or combination of conditions can protect the community or reasonably assure her appearance. The Defendant has engaged in a years-long, multi-state campaign of cyber-harassment and stalking against individuals who she believes wronged her, including those peoples' lawyers, and even her own lawyers. She has weaponized AI to generate defamatory content and violated court orders, resulting in multiple convictions and pending charges, including perjury. She has also stated, on jail calls, that she intends to flee from her misdemeanor charges if released. She is now charged with felonies. Accordingly, this Court must order the Defendant detained pretrial.

## I. FACTUAL BACKGROUND

### *A. The Defendant's Violent Past*

In 2015, the Defendant—then 18 and known by her birth name, Melissa Truesdell—participated in a calculated kidnapping and armed robbery of an ex-boyfriend. According to the arrest report, the Defendant enticed the victim to come towards her car, where he was grabbed by male accomplices, forced into the car, held at knifepoint, forced to provide his wallet and cell phone, and punched in the face. While being driven away from the site of the kidnapping, the

victim told law enforcement that he heard the Defendant say, "Shoot him and we'll leave his body in Addison." For this conduct, the Defendant was sentenced to 6 years' incarceration.

*B. Victim 1 (D.G.)*

Following her release from incarceration, the Defendant began working as a professional companion and OnlyFans model under the names Emily Smith and Isabella Lux. In this capacity, she met Victim D.G., a religious leader. Over the course of 3 years, D.G. provided the Defendant over $300,000. In 2023, when D.G. discovered the Defendant's true identity and criminal history, he attempted to end the relationship. In response, the Defendant sent D.G. and his colleagues and congregation numerous emails with false statements, including that he was a pedophile who was "as bad as the Catholic priests" and that he paid young escorts to degrade and abuse them. This conduct caused D.G. substantial emotional distress.

*C. Victim 2 (G.H.)*

In April 2024, the Defendant met Victim G.H.—Count 1 in the Indictment—at a singles retreat in El Salvador. G.H. is a licensed physician in Miami. The two had a consensual sexual relationship. However, in May 2024, G.H. told the Defendant that he did not want a romantic relationship with her. The Defendant did not take this well. In response, the Defendant repeatedly sent defamatory messages to G.H., as well as his family and his friends. When G.H. blocked her phone number, she would use a new one. When G.H. told her to stop, she increased her barrage.

The Defendant told G.H. that she wanted to kill herself and was going to go to Switzerland for assisted suicide, and she would blame him. She then called G.H. on FaceTime and took a handful of pills. G.H. then called 911. The Defendant sent G.H. pictures of her arm with cuts on it, sent him $1,000 to be her personal doctor, and a fabricated letter from a lawyer. Despite being told unequivocally to stop, the Defendant contacted G.H. hundreds of times from dozens of different phone numbers.

Then, the Defendant falsely reported to G.H.'s hospital that he pushed her down a flight of stairs, triggering an investigation (G.H. was later cleared). She also accused him of rape (again, he was later cleared). She told him that she was tracking him and sent him pictures of his car. The Defendant created a website that falsely accused G.H. of, among other things, stealing drugs, drugging patients, having sex with patients while unconscious, having HIV, and incest with his sister. The Defendant fabricated a document which purported to be G.H.'s laboratory test results, falsely showing that he had sexually transmitted diseases.

Later, the Defendant hired a freelancer to pass out flyers with links to a TikTok account with defamatory statements about G.H. The Defendant and the freelancer passed the flyers out in G.H.'s apartment complex and the area surrounding his hospital. In June 2024, the Defendant sent photos of herself in G.H.'s building to show that she had access to the building. This unwanted conduct caused G.H. substantial emotional distress and caused him to modify his behavior out of fear of his own safety.

### *D. Victim 3 (E.D.)*

In June 2024, G.H. hired a lawyer—E.D., Count 2 in the Indictment—to obtain a temporary restraining order in Miami-Dade County. E.D. was successful in obtaining the TRO and was also able to get the defamatory website removed from the internet. E.D. communicated with the Defendant to attempt to get her to stop her harassing conduct. E.D. received a letter from the Defendant's then-lawyer demanding $180,000 to resolve the dispute.

In response to the removal of the website, the Defendant created a *second* website with pictures of G.H., E.D., and E.D.'s minor children. The Defendant texted E.D. threatening and false messages like:

- I will report you to all of the local Attorney disciplinary Committees. I'm making a website specifically about you and a TikTok page about you and a TikTok page

about how you can't keep your legs closed and remain professional with male clients.

- The investigator [that I hired] also came across pornographic images of you on the Internet on multiple different sites. Does your family and kids know about this?

These messages caused E.D. substantial emotional distress. In September 2024, the Defendant messaged E.D.:

> I'm giving you one chance to back off and remove yourself from this situation, or you'll regret it. If you don't take this one opportunity, everyone at [E.D.'s children's school]-your family, friends, and anyone ever associated with you-will know everything: how you were a former amateur porn star, your currently on only fans selling nudes, and how you sleep with male clients. I have the photos and videos of you [E.D.]. There's no denying it; it's clearly you. So, you can either step back now or regret it later. Your kids' teachers, the principal, other parents-everyone will know. This is your one opportunity to back off. If you're smart, you'll take it. If not, that's your choice. It doesn't matter to me either way. You will be left off this new edition of the website under three conditions, you formally end your representation and involvement with [G.H.] and stop sucking his dick and provide proof, And I never hear another word from you again. Fail to do so, I have about 20 people on retainer that are going to make you famous [E.D.]. Thousands of dollars were paid for a PR company, a political smear campaign specialist, you've been monitored by a Pl for the last two weeks. I know everything about you, I know where you go. I know what you do. I know what you're doing right now.

Following this message, E.D. spoke with her children out of fear that they would encounter deepfake images of her or that the Defendant would contact her children. Due to this conduct, E.D. felt substantial emotional distress.

*E. Victim 4 (N.O.)*

In June 2024, in response to receiving G.H.'s legal process, the Defendant hired a Texas lawyer, N.O.—the Victim in Count 3 of the Indictment—to defend the Florida TRO. N.O. quickly fired the Defendant as a client. Following the firing, the Defendant turned her focus to N.O. The Defendant texted N.O. more than 20 times a day with harassing and threatening messages. The Defendant posted negative reviews online and claimed that N.O.'s wife was a prostitute and a porn star and was doing porn to finance her divorce.

On July 10, 2024, N.O. sought and was granted a restraining order against the Defendant. In response, the Defendant told N.O. that she would go to his daughter's school and tell the principal that he was a pedophile. She also said that she would tell people that N.O. had sex with minors and animals, loved little girls, and gave his daughters and wife HIV and AIDS.

On July 11, 2024, N.O. landed in Maryland for a reverse proffer with the FBI for one of his clients. Upon turning his phone off airplane mode, he received an "uncountable" number of text messages including one photo with the face of a 10-year-old girl and the body of an adult with exposed breasts in a suggestive position. He also received a photo of a fully clothed adult with a child's face in a suggestive position. Eventually, N.O.—worried he possessed child pornography—provided his phone to the FBI.

In August 2024, the Defendant told N.O. that, if he didn't continue to represent her, she would publish a video of her giving him a blowjob. Since the Defendant had already altered images, like the child pornography, he was concerned about any future images she could modify to show them together. In October 2024, the Defendant was arrested for violating the TRO that N.O. obtained against her.

This conduct caused N.O. substantial emotional distress.

*F. Victims 5 and 6 (K.M. and A.M.)*

In August 2025, the Defendant hired K.M. to represent her in connection with an August 2025 arrest for possession of controlled substances. The Defendant never met K.M. in person, however, she called him incessantly. When he did not respond as she wished, she accused him of sexual misconduct against her. She used artificial intelligence to make it appear that he commented on her Isabella Lux website.

As to A.M.—K.M.'s wife and also a lawyer—the Defendant sent defamatory messages and links to A.M., her law partners, and judges in the Chicago area, including over 1,600 emails accusing A.M. of sexual misconduct.

Both K.M. and A.M. have obtained orders of protection in Illinois.

*G. Victim 7 (D.E.)*

The Defendant met D.E. on a dating application in August 2024. They had a sexual relationship between August and October 2024. D.E. ended the relationship in late October or early November 2024. In response, the Defendant accused D.E. of stealing her pills, threatened to sue him, and threatened to accuse him of raping her. In November and December 2024, D.E. and the Defendant were "friends with benefits." During this time, the Defendant repeatedly threatened to kill herself.

On January 19, 2025, the Defendant purchased a ticket to Switzerland for D.E. so he could be with her when she attended an assisted suicide clinic. On January 29, 2025, the Defendant filed a police report against D.E. claiming that he sexually assaulted her.

Around March 2025, D.E. ceased all contact with the Defendant. In response, she sent him pictures of cut wrists indicating self-harm and said that she was going to kill herself. She also began emailing his work, creating social media accounts and posting defamatory things about D.E. online. D.E. obtained a restraining order. Due to the Defendant's conduct and D.E.'s association with her, D.E. was fired.

Due to this conduct, D.E. felt substantial emotional distress.

7. Other Crimes

In October 2024, the Defendant was arrested in Illinois for resisting arrest without violence and for violating the Texas restraining order against N.O.

In August 2025, the Defendant was arrested in Illinois for possession of narcotics.

In May 2025, the Defendant filed a lawsuit against D.E. in DuPage County Circuit Court case. In conjunction with the filing, the Defendant claimed under oath that she had no wages and earnings in the prior 12 months, when she actually made more than $10,000 in the prior twelve months. For this conduct, the Defendant was charged with Perjury and Forgery in Illinois state court. *See People of the State of Illinois v. Emily Smith*, 2025CF002390. See Ex 1.

On or about March 11. 2026, the Defendant was released from custody. She was arrested on March 23 or violating a restraining order against a different former attorney R.F. This time, she was detained pending trial. While incarcerated, the Defendant has mentioned on recorded jail calls that her bond was only extraditable in the Midwest and that, if released, she would leave the area from which she could be extradited.

On July 29, 2026, the Defendant was convicted by a jury of violating a no-contact order and sentenced to 180 days in jail. *See* Ex 2.

On August 19, 2026, the Defendant was convicted by a jury of violating a *second* no-contact order and sentenced to 212 days in jail. *See* Ex 3.

The Defendant has pending charges for violating a no-contact order (in Texas) and for perjury (in Illinois).

The undersigned calculates that the Defendant has seven criminal history points. The undersigned calculates a base offense level of 25. Without acceptance, her Guidelines range is 84 to 105 months' incarceration.

## II. LEGAL STANDARD

A court shall determine whether "conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning:"

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## III. <u>ARGUMENT</u>

The Section 3142(g) factors show that the Defendant must be detained pre-trial.

*First*, as to the nature and circumstances of the offense charged, the Defendant is charged with serious offenses. 18 U.S.C. § 3142(g)(1). The Defendant is charged with three counts of cyberstalking against three different people. Cyberstalking, in violation of Title 18, United States Code, Section 2261A, is a serious offense. *See United States v. Wagner*, ___ F.4th ___, 2026 WL 2333589, at *4–*5 (6th Cir. Aug. 12, 2026) (reversing district court's grant of bail, concluding that cyberstalking was serious, and noting that "[n]either Wagner nor the dissent disputes that the charged offenses are serious."). In fact, courts have held that cyberstalking is a crime of violence for purposes of the Bail Reform Act. *See, e.g.*, *United States v. Harrison*, 354 F. Supp. 3d 270, 278 (W.D.N.Y. 2018) ("On the limited arguments before the Court, the Court agrees with the reasoning in *Grooms* and finds cyberstalking in violation of 18 U.S.C. § 2261A(2) categorically involves a substantial risk that physical force against the person or property of another may be

used in the course of committing the offense, so that pretrial detention is available pursuant to 18 U.S.C. § 3142(f)(1)(A) to address pretrial dangers posed by release of a defendant pending trial.”).

The Defendant’s conduct is sustained, spanning multiple years and multiple states, against former clients, former romantic partners, those people’s lawyers, and her own former lawyers. Her conduct spans multiple states (Illinois, Florida, and Texas). Her conduct involves using AI-generated conduct to threaten her victims with false allegations of sexual misconduct and is calculated to generate maximum distress by threatening her victims’ children, marriages, and livelihoods.

*Second*, the weight of the evidence is overwhelming. 18 U.S.C. § 3142(g)(2). The Defendant sent hundreds of messages from phone numbers and e-mails in which her name was the subscriber, or in which she provided her name in the message, or in which posted photos of herself. There is no “identity” defense. Further, the Defendant’s conduct was both sustained and severe. She was told by her victims that her conduct was distressing. She cannot argue that she did not realize her conduct was calculated to, and did, cause severe emotional distress.

*Third*, the Defendant’s history and circumstances strongly support detention for four reasons. 18 U.S.C. § 3142(g)(3). *One*, the Defendant has a demonstrated history of failure to comply with Court orders—in the past few months being convicted of violating court orders in jury trials. *Two*, the Defendant has stated her intent to violate bond conditions on jail calls. *Three*, the Defendant has no ties to South Florida. She has no family here, has no job here, owns no property, and it appears that the only occasions she has visited this district is to commit acts of harassment against her victims. *Four*, the Defendant—having already served a 6-year sentence for armed robbery—faces a lengthy sentence here, with Guidelines at approximately 84 to 105 months.

*Fourth*, the Defendant has a demonstrated history of threatening witnesses against her, 18 U.S.C. § 3142(g)(4), including multiple convictions for violating Court no-contact orders.

**CONCLUSION**

For all these reasons—including the Defendant's repeated violations of court orders, her pending perjury charges, her lack of community ties, her stated intent to flee, and her extensive history of violent and threatening conduct—no conditions of release can reasonably assure her appearance or the safety of the community. The Court should order her detained pending trial.

`

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Daniel Rosenfeld*
Daniel Rosenfeld
Assistant United States Attorney
Court ID No. A5503081
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9268
Email: Daniel.Rosenfeld@usdoj.gov